UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
JUDITH REILLY,                 )
                               )
        Plaintiff,             )
                               )
        v.                     )    C.A. No. 10-461 S
                               )
CITY OF PROVIDENCE, by and through )
its Treasurer, Stephen T.      )
Napolitano; PAUL KENNEDY,      )
individually and in his official )
capacity as police officer in the )
City of Providence Police Dept.; )
ALYSSA DEANDRADE, individually and )
in her official capacity as police )
officer in the City of Providence )
Police Dept.; and DEAN ESSERMAN, )
individually and in his official )
capacity as Chief of the City of )
Providence Police Dept.,       )
                               )
        Defendants.            )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff Judith Reilly filed this action against Defendants City of Providence ("City"), Dean Esserman, Paul Kennedy, and Alyssa DeAndrade pursuant to 42 U.S.C. § 1983, alleging a violation of her First Amendment right to freedom of speech.[1]  Now before the Court are the parties' cross-motions for

---

[1] In her Memorandum of Law, Plaintiff also asserts that her right to freedom of the press has been violated.  However, she fails to set forth any separate argument on this point.  For this reason, the Court treats Plaintiff's freedom of the press

summary judgment.   For the reasons set forth below, those motions are DENIED.

I.   Facts

The following facts are undisputed except as indicated.   On February 2, 2010, at 7:00 p.m., the former Mayor of Providence, David Cicilline ("Mayor"), was scheduled to deliver the State of the City address at the Providence Career and Technical Academy ("PCTA").   The PCTA auditorium has a maximum capacity of approximately 396 people.   (Statement of Undisputed Facts in Supp. of Pl.'s Mot. for Partial Summ. J. and in Opp'n to Defs.' Mots. for Summ. J. ("Pl.'s SUF") ¶ 35, ECF No. 39.)

The front of the PCTA, where the main entrance is located, runs 300 feet along Cranston Street.   It is bound by Fricker Street at one end and an athletic field at the other.   There are multiple sets of doors on the Cranston Street side of the PCTA. These doors exit onto a plaza area which is separated from the lower sidewalk by two to three steps (depending on the

---

claim as "encompassed" in her freedom of speech claim.   See McTernan v. City of York, PA, 564 F.3d 636, 644 n.3 (3d Cir. 2009).

Along similar lines, Plaintiff seeks relief directly under the Rhode Island Constitution for alleged violations of her state constitutional rights, but she fails to draw any distinction between her federal and state constitutional claims. Plaintiff has thus waived any argument that the Rhode Island Constitution affords broader freedom of speech protection than the First Amendment to the Federal Constitution.   See Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 748-49 (1st Cir. 1995).

location).  The plaza area, or upper sidewalk, is 170 feet long and ranges in width from about thirteen and one-half feet to twenty feet.  (Id. at ¶ 25.)  The lower sidewalk in front of the PCTA ranges in width from about fifteen feet to seventeen and one-half feet.  (Id. at ¶ 24.)

Across Cranston Street from the PCTA is a Citizens Bank with a parking lot.  Across Fricker Street is the Central High School parking lot.  On February 2, 2010, attendees of the Mayor's address utilized both the Citizens Bank parking lot and the Central High School parking lot.

At all relevant times, Defendant Esserman was the Chief of the Providence Police Department ("PPD").  As Chief, Esserman was the "ultimate authority" on all PPD policy.  (Ex. 32 to Pl.'s Cross Mot. for Partial Summ. J. ("Pl.'s Mot.") (Esserman Dep. 10:22-11:15), ECF No. 44.)  Defendants Kennedy and DeAndrade were officers in the PPD.  On February 2, 2010, both Esserman and Kennedy attended the Mayor's State of the City address.  DeAndrade, meanwhile, was assigned to supervise a group of four patrolmen charged with ensuring the safe crossing of pedestrian traffic heading into the event.

At approximately 6:30 p.m. Plaintiff and a friend, Oscar Lemus, arrived at the event, intending to distribute flyers criticizing the Mayor for re-appointing Steven Durkee, who had been accused of an ethics violation, to the City Planning

3

Commission.  (See Ex. 3 to Pl.'s Mot. 36 (Flyer), ECF No. 41-1.)
The flyers featured the Mayor's name in large lettering.  (Ex.
30 to Pl.'s Mot. (Reilly Dep. 57:6-12, 58:3-59:3), ECF No. 43.)
Upon arrival, Plaintiff proceeded to the Fricker Street end of
the PCTA to begin passing out flyers.  Lemus went to the
athletic field end of the building.  Pedestrian traffic was
initially light but increased as the event start time drew
closer.  (Ex. 34 to Pl.'s Mot. (Lemus Dep. 45:10-17), ECF No.
44; see also Pl.'s SUF ¶ 52 ("[F]oot traffic was relatively
sparse.").)  While small crowds of three to four people gathered
on the sidewalk, there is no evidence that Plaintiff obstructed
pedestrian traffic.  (Pl.'s SUF ¶¶ 110, 112.)

     After her initial arrival, Plaintiff moved closer to the
main entrance of the auditorium.  (Defs. City of Providence,
Dean Esserman, and Paul Kennedy's Statement of Undisputed Facts
("Defs.' SUF") ¶ 24, ECF No. 34; Def. DeAndrade's Statement of
Undisputed Facts ¶ 19, ECF No. 31.)  Esserman, who was inside
the PCTA, testified that he was approached by someone who told
him about flyers being distributed or people obstructing the
entrance, but Esserman did not recall which.  (Esserman Dep.
22:4-15.)  Esserman believes he asked Kennedy to check out the
situation and address it.  (Pl.'s SUF ¶ 55.)  Kennedy, who was
also inside the PCTA, testified that he opened the door and told
DeAndrade, "if there are people blocking, move them."  (Defs.

City of Providence, Dean Esserman, and Paul Kennedy's Statement of Disputed Facts ("Defs.' SDF") ¶ 56, ECF No. 48.) DeAndrade, however, testified that Kennedy instructed her to "move [Plaintiff and Lemus] from the front of the building." (Ex. 31 to Pl.'s Mot. (DeAndrade Dep. 32:5-8), ECF No. 43.) DeAndrade accordingly ordered the four patrolmen under her command to "clear the sidewalk." (Id. at 36:10-11.)

Plaintiff testified that an officer approached and told her she could not distribute flyers anywhere on the city block in front of the PCTA. To continue distribution, she had to move across Cranston Street to Citizens Bank, across Fricker Street to the Central High School parking lot, or to the athletic field. (Reilly Dep. 41:6-12, 42:24-43:16.) After this conversation, Plaintiff moved down the sidewalk to the corner of Fricker Street and continued distributing flyers. (Pl.'s SUF ¶ 66.) She later moved back toward the entrance, at which point she was again approached by a police officer and threatened with arrest. (Id. at ¶ 67.) Plaintiff responded by moving across Fricker Street. (Id. at ¶ 68.) Lemus testified that, around this time, he noticed the Mayor and upper-level PPD officers looking out the windows of the PCTA at Plaintiff. (Lemus Dep. 49:2-19, 69:2-70:22.) At some point, Plaintiff moved back across the street to the sidewalk in front of the PCTA. Almost immediately, Plaintiff was approached by DeAndrade who

5

reiterated that Plaintiff would be arrested if she continued to distribute flyers in front of the school. (Pl.'s SUF ¶ 77.)

According to Plaintiff, DeAndrade told her that she could pass out flyers across Cranston Street, across Fricker Street, or at the athletic field. (Reilly Dep. 63:12-22.) DeAndrade, on the other hand, testified that Plaintiff was allowed to remain on the sidewalk in front of the PCTA, so long as she confined herself to "the corner side where there are no more doors." (Ex. I to Defs.' SDF (DeAndrade Dep. 65:9-19), ECF No. 48-1; see also Ex. 26 to Pl.'s Mot. (DeAndrade Interrog. No. 7) ("The plaintiff and another male were ordered to move over to either side of the stairway . . . ."), ECF No. 42.) In any event, DeAndrade provided no explanation as to why Plaintiff was being ordered to relocate. (DeAndrade Dep. 40:19-41:3.) Plaintiff responded by moving across the street to the Citizens Bank parking lot. (Pl.'s SUF ¶ 95.) At approximately 7:00 p.m., Plaintiff and Lemus left the vicinity altogether. (Reilly Dep. 36:18-22.) Esserman, Kennedy, and DeAndrade all testified that they were unaware of the contents of Plaintiff's flyers. (Esserman Dep. 23:1-3; Ex. III to Defs.' SDF (Kennedy Dep. 20:7-21:11), ECF No. 48-3; DeAndrade Dep. 45:2-18.)

The first two times Plaintiff was approached by the police, she was approximately eighty to 100 feet from the main entrance of the auditorium. (Pl.'s SUF ¶ 98.) When she was approached

6

by DeAndrade, Plaintiff was approximately fifty feet from the entrance. (Id. at ¶ 99.)

On February 16, 2010, Plaintiff filed a civilian complaint with the PPD. (Ex. 17 to Pl.'s Mot. 2 (Civilian Compl.), ECF No. 42.) PPD procedures require such complaints to be investigated within thirty days (or an additional thirty days where cause is shown). (Ex. 22 to Pl.'s Mot. 18, ECF No. 42.) These procedures also call for the complainant to be notified once a case is closed. (Esserman Dep.31:25-32:5.) Plaintiff, however, never received any notice of the resolution of her complaint. (Pl.'s SUF ¶ 139.)

In response to an interrogatory requesting a description of why Plaintiff was asked to move, all Defendants cited the authority of a sworn police officer "to keep open exit passageways in the event of the necessity for a mass evacuation of [a] building for unforeseen circumstances such as bomb scares or other matters that would necessitate an evacuation." (Exs. 26-29 to Pl.'s Mot. (DeAndrade, Kennedy, City, and Esserman Interrogs. No. 7), ECF No. 42.)

II.  Discussion

Summary judgment is appropriate when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Taylor

7

v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor, 576 F.3d at 24 (internal citation and quotation marks omitted).

"[T]he standards are the same where, as here, both parties have moved for summary judgment." Pac. Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004) (quoting Bienkowski v. Ne. Univ., 285 F.3d 138, 140 (1st Cir. 2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."))); see also Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." (quoting Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006))).

A.   First Amendment

The Supreme Court has laid out a three-step process for courts to follow in assessing whether a plaintiff's First Amendment right to freedom of speech has been violated. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788,

797 (1985).   The Court "must first decide whether [the conduct at issue] is speech protected by the First Amendment."   Id. Assuming an affirmative answer to that question, the Court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic."   Id.   "Finally, [the Court] must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard."   Id.

In the present case, the parties agree on the application of the first two steps of the First Amendment inquiry.   It is undisputed that Plaintiff's distribution of leaflets constituted protected speech, see, e.g., United States v. Grace, 461 U.S. 171, 176 (1983), and that the sidewalk in front of the PCTA is a public forum, see, e.g., id. at 177.   However, even in these circumstances, "the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."   Id. (internal citation and quotation marks omitted).   The First Circuit has referred to this inquiry as "intermediate scrutiny."   See Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736-37 (1st Cir. 1995).

1.   Content-neutrality

The "principal inquiry" in assessing content-neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 183 (1st Cir. 1996) (quoting Nat'l Amusements, 43 F.3d at 737). Accordingly, "[t]he government's purpose is the controlling consideration." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

Here, Esserman, Kennedy, and DeAndrade all testified that they were not aware of the contents of Plaintiff's flyers. Plaintiff, however, contends that circumstantial evidence in the record supports the inference that Defendants were aware of and motivated by the contents of the flyers when they ordered her to relocate.   Plaintiff cites (1) Lemus's testimony that he observed the Mayor and upper-level PPD officers at the windows of the PCTA looking at Plaintiff; (2) the fact that the flyers featured the Mayor's name in large lettering; (3) the weakness of Defendants' public safety rationale for ordering Plaintiff to move, see infra pp. 11-19; (4) the City's failure to process Plaintiff's civilian complaint in the manner required by PPD procedures; and (5) the fact that, on the evening of February 2, 2010, Defendants never informed Plaintiff of the purported public safety justification for their orders.   Based on this

evidence, a reasonable fact-finder could infer that Defendants acted because of the contents of the flyers.  See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle, 430 F. Supp. 2d 1185, 1192-94 (W.D. Wash. 2006) (finding sufficient circumstantial evidence "from which a reasonable juror could conclude" that the restriction at issue was motivated by content), rev'd on other grounds, 550 F.3d 788 (9th Cir. 2008).[2]

> 2. Narrow tailoring to serve a significant government interest[3]

The Supreme Court has held that a time, place, and manner restriction on protected speech satisfies the requirement of narrow tailoring "so long as the . . . regulation promotes a substantial[4] government interest that would be achieved less effectively absent the regulation."  Ward, 491 U.S. at 799

---

[2] While the Court finds the restrictions on Plaintiff's speech unconstitutional regardless of their motivation, see infra pp. 11-19, the content-neutrality of Defendants' conduct is relevant to the issue of qualified immunity, discussed below.

[3] Because this Court finds that Defendants' conduct fails to satisfy even intermediate scrutiny, see infra pp. 11-19, it need not address Plaintiff's contention that heightened scrutiny applies to police directives under the Supreme Court's decision in Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (applying heightened scrutiny to an injunction).

[4] The terms "significant interest" and "substantial interest" have been used interchangeably by courts in this context.  See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 188 n.14 (1st Cir. 1996).

(internal citation and quotation marks omitted) (alteration in original).  The regulation "need not be the least restrictive or least intrusive means" of promoting the government interest. Id. at 798.  The Court went on to caution that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests."  Id. at 799.

In the present case, Defendants offer two potentially substantial government interests to justify their conduct. First, they suggest that ordering Plaintiff to relocate advanced the government's interest in maintaining the movement of pedestrian traffic on the sidewalk in front of the PCTA. Second, they point to the government's interest in ensuring that emergency exits are clear in the event of a mass evacuation. Each of these interests qualifies as "substantial" in the abstract.  See, e.g., Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) (finding substantial government interests in "the orderly movement and control" of persons at a state fair and "protecting the safety and convenience" of the public (internal quotation marks omitted)).

"That the Government's asserted interests are important in the abstract does not mean, however, that the [restriction on speech] will in fact advance those interests."  Turner Broad.

12

Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994).  In order to satisfy intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  Id.  Similarly, the First Circuit has warned, "a governmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial."  Nat'l Amusements, 43 F.3d at 741.

Several courts have invalidated bans on leafleting and other expressive activity in the absence of any evidence that the plaintiff's conduct interfered with the asserted government interest.  See Grace, 461 U.S. at 182 (holding a ban on expressive conduct on the sidewalks surrounding the Supreme Court building unconstitutional because there was no indication that the plaintiffs' activities "in any way obstructed the sidewalks or access to the building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds"); Bays v. City of Fairborn, 668 F.3d 814, 823 (6th Cir. 2012) (finding restrictions on solicitation at a festival unconstitutional where the defendants failed to "point[] to any specific space or crowd concerns"); Saieg v. City of Dearborn, 641 F.3d 727, 736-37 (6th Cir. 2011) (dismissing the defendants' concerns about "pedestrian overcrowding" at a festival as

"conjectural"); Kuba v. 1-A Agric. Ass'n, 387 F.3d 850, 859 (9th
Cir. 2004) (finding restrictions on demonstrations outside an
arena unconstitutional because the defendant "failed to meet its
burden of proving that demonstrators handing out leaflets and
carrying signs on the parking lots and walkways outside the
[venue] would cause [] congestion and danger to safety");
Weinberg v. City of Chicago, 310 F.3d 1029, 1039 (7th Cir. 2002)
(holding a ban on "peddling" within 1,000 feet of a sports arena
unconstitutional because the defendant "provided no objective
evidence that traffic flow on the sidewalk or street is
disrupted when [the plaintiff] sells his book"); Lederman v.
United States, 291 F.3d 36, 45 (D.C. Cir. 2002) (invalidating a
ban on demonstration activities on the sidewalk in front of the
steps to the United States Capitol on the grounds that "[s]ome
banned activities," such as leafleting, "cannot possibly"
interfere with pedestrian traffic).

In the present case, viewing the facts in the light most
favorable to Defendants, PPD officers ordered Plaintiff to
vacate the 170 foot stretch of sidewalk in front of the steps to
the PCTA.[5]   These orders are not justified by the government's

---

[5] While there is a genuine issue of fact concerning whether
Plaintiff was ordered to leave the 170 foot long area in front
of the steps or the entire approximately 300 foot long block,
this discrepancy is not material to the merits of Plaintiff's
First Amendment claim.  Defendants' conduct was unconstitutional
in either case.

interest in maintaining the movement of pedestrian traffic. Indeed, "[t]he Supreme Court has dismissed the danger to traffic congestion as a justification to ban leafletting." Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319, 1324 (1st Cir. 1993), abrogated on other grounds by Thomas v. Chicago Park Dist., 534 U.S. 316 (2002).  This is because "'[t]he distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey.'  Bottlenecks, therefore, are unlikely to develop." Id. (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 690 (1992) (O'Connor, J., concurring)) (internal quotation marks and citations omitted) (alteration in original). Moreover, there is, unsurprisingly, no evidence that Plaintiff's leafleting at the Mayor's State of the City address blocked pedestrian traffic.

Defendants' second asserted substantial interest, namely ensuring that emergency exits are clear in the event of a mass evacuation, also fails to justify the orders.  It is undisputed that those orders were not limited to the upper sidewalk or plaza area.  Plaintiff was also banned from a significant stretch of the lower sidewalk.  There is no evidence in the record, beyond Defendants' bald assertions, that Plaintiff's presence in this area would have posed a hazard in the event of a mass evacuation.  Additionally, because leafleters are only

15

marginally more obstructive than other pedestrians, see id. at 1324, Defendants' decision to ban only Plaintiff and her companion from the lower sidewalk while allowing all other pedestrians access to that same stretch of sidewalk undermines the credibility of their purported public safety justification. See Saieg, 641 F.3d at 737 (holding that the defendants' decision to keep sidewalks adjacent to the festival open to public traffic "erode[d] the significance of the government's interest in restricting leafleting on those same sidewalks"); Kuba, 387 F.3d at 860-61 (noting that the plaintiff was "not asking to protest in an area that he would otherwise be unable to access"); Lederman, 291 F.3d at 345 ("[A] single leafleteer standing on the [sidewalk in front of the Capitol building] will no more likely block traffic or threaten security than will photographers, star-struck tourists, and landscape painters complete with easels, but the Board has made no effort to keep any of these latter individuals away from the Capitol.").

Defendants attempt to distinguish the authority relied on by Plaintiff on the grounds that Esserman received a complaint about individuals obstructing the doors to the PCTA. This argument does not withstand close scrutiny. As a preliminary matter, the record does not bear out Defendants' claim. Esserman testified that he could not recall whether the complaint he received concerned "people obstructing" or merely

16

distributing flyers.  Moreover, the complaint was a hearsay statement that cannot be relied upon at the summary judgment stage to create a genuine issue of fact as to whether Plaintiff actually obstructed traffic.  See Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").  Police officers may not seize upon secondhand information to restrict a citizen's speech without making any effort to verify that the individual is, in fact, obstructing access to a building.  Thus, the restrictions imposed on Plaintiff's speech in this case were not narrowly tailored to a significant government interest and, accordingly, they violated the First Amendment.

The cases cited by Defendants are all distinguishable.  In Marcavage v. City of Chicago, 659 F.3d 626, 628-29 (7th Cir. 2011), the Seventh Circuit upheld certain restrictions on speech imposed at the "Gay Games."  The plaintiffs twice attempted to demonstrate on crowded sidewalks outside stadiums where events were being held.  On both occasions, officers ordered the plaintiffs to move.  In finding the officers' orders constitutional, the Seventh Circuit rejected the plaintiffs' argument that they did not block the sidewalks.  The Court noted that video recordings of the events "plainly show pedestrians walking around [the plaintiffs] while they remain stationary."

17

Id. at 631 n.2.   This evidence differentiates Marcavage from the present case.

In Marcavage v. City of New York, 689 F.3d 98, 101 (2d Cir. 2012), the Second Circuit upheld restrictions on protesting outside of the 2004 Republican National Convention, which was held at Madison Square Garden.   The Court noted that 50,000 people were expected to attend the convention and that 600,000 people pass through Penn Station each day.   Id.   In these circumstances, it found the restrictions on speech justified by the government's interest in avoiding congestion of pedestrian traffic.   Id. at 104-05; see also Heffron, 452 U.S. at 643 (upholding restrictions on expressive conduct at a state fair with an average daily attendance of between 115,000 and 160,000).   The present case presents no such extraordinary circumstances.   The PCTA auditorium's maximum capacity is approximately 396 persons, and it is undisputed that pedestrian traffic outside the building was "relatively sparse."

The other two cases primarily relied on by Defendants involved government interests different than those at issue here.   However, in both cases, the First Circuit noted the existence of evidence tying the restriction imposed to the interest it purportedly served.   See Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 13 (1st Cir. 2004) (finding restrictions on speech outside the 2004 Democratic National Convention

18

justified by the government's interest in maintaining security where the security measures instituted were specifically designed "in light of recent past experience with large demonstrations"); Globe, 100 F.3d at 188-89 (finding a ban on newsracks in Boston's historic Beacon Hill District justified by the government's interest in preserving aesthetics because newsracks "did not exist at the time with which the [defendant's] preservation efforts are concerned").[6]

3.   Ample alternative channels of communication.

Ample alternative channels of communication may exist even where the restriction imposed "reduce[s] to some degree the potential audience" for the plaintiff's speech. Ward, 491 U.S. at 802.   Indeed, the First Circuit has made clear that "some diminution in the overall quantity of speech will be tolerated." Globe, 100 F.3d at 194 (quoting Nat'l Amusements, 43 F.3d at 745).   Here, viewing the facts in the light most favorable to Plaintiff, Defendants' conduct left open adequate alternatives. It is undisputed that Plaintiff could have continued to distribute flyers across Cranston Street near the Citizens Bank

---

[6] Plaintiff's additional argument that Defendants' actions were not narrowly tailored to the government's substantial interest in protecting public safety because there was no indication that mass evacuation would be necessary is unpersuasive.   "[N]o express threat or special imminence is required before [the Court] may accord great weight to the government's interest in staving off considerable harm." Marcavage v. City of New York, 689 F.3d 98, 105 (2d Cir. 2012) (internal quotation marks omitted).

parking lot, across Fricker Street near the Central High School parking lot, or at the athletic field.  While Plaintiff contends that, from these locations, she was not able to access all attendees of the Mayor's speech, she clearly could have distributed flyers to at least a portion of those attendees, many of whom parked in the Citizens Bank or Central High School lots.

B.   Qualified Immunity

The Court's conclusion that Plaintiff was deprived of her First Amendment right to freedom of speech does not end the inquiry.  It remains to be seen which, if any, Defendant(s) is liable for that violation.

The doctrine of qualified immunity protects public officials [7] from liability for civil damages [8] so long as their

_____

[7] "[U]nlike various government officials, municipalities do not enjoy immunity from suit–either absolute or qualified–under § 1983." Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993) (citing Owen v. City of Independence, 445 U.S. 622, 650 (1980)); see also Walden v. City of Providence, R.I., 596 F.3d 38, 55 n.23 (1st Cir. 2010) ("Unlike individual defendants, municipalities are not entitled to qualified immunity.").  The First Circuit has suggested that a municipality may not be held liable for a failure to train where the individual defendants are entitled to qualified immunity because of "the unsettled state of the law." Joyce v. Town of Tewksbury, Mass., 112 F.3d 19, 23 (1st Cir. 1997).  This decision has not, however, been interpreted to preclude municipal liability where individual defendants are protected by qualified immunity.  See Buchanan ex rel. Estate of Buchanan v. Maine, 417 F. Supp. 2d 45, 66 (D. Me. 2006), aff'd sub nom. Buchanan v. Maine, 469 F.3d 158 (1st Cir. 2006).  Thus, Defendant City is not entitled to qualified immunity here.  The

conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).   In order to determine whether Defendants are entitled to qualified immunity, the Court must ask:   "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).   The First Circuit has explained that the second step of the qualified immunity inquiry "has two parts:   (a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." Id.   The Supreme Court has stressed that "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Ashcroft v.

same is true for Defendants Esserman, Kennedy, and DeAndrade in their official capacities.   See Kentucky v. Graham, 473 U.S. 159, 167 (1985) ("In an official-capacity action, [the defense of qualified immunity is] unavailable.").

   [8] Qualified immunity is also unavailable in "§ 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages." Pearson v. Callahan, 555 U.S. 223, 242 (2009).

al-Kidd, 131 S. Ct. 2074, 2085 (2011)).  This is because "[a]
right is clearly established and immunity will not issue only if
'every reasonable official would have understood that what he is
doing violates that right.'"  Id. at 50-51 (quoting al-Kidd, 131
S. Ct. at 2083) (internal quotation marks omitted).

    This Court has already determined that Defendants violated
Plaintiff's constitutional right.  The question thus becomes
whether that right was clearly established at the time the
violation occurred.  To answer this question, courts may look to
controlling authority or a "consensus of cases of persuasive
authority."  Wilson v. Layne, 526 U.S. 603, 617 (1999).  An
official may be protected by qualified immunity "even where the
abstract 'right' invoked by the plaintiff is well-established,
so long as the official could reasonably have believed 'on the
facts' that no violation existed."  Diaz-Bigio, 652 F.3d at 50
(internal citation omitted); see also id. at 52 (framing the
relevant question as "whether a reasonably competent city
official could have thought that he or she would not violate the
First Amendment by terminating [the plaintiff's] employment
given the circumstances of the case" (emphasis added)).  Indeed,
"if the existence of a right or the degree of protection it
warrants in a particular context is subject to a balancing test,
the right can rarely be considered 'clearly established,' at
least in the absence of closely corresponding factual or legal

precedent." Id. at 53 (quoting Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992)).

The dispositive question in the present case is whether a reasonably competent police officer could have thought that the restrictions imposed on Plaintiff's speech were constitutional.[9] Because narrow tailoring is "not an exact science," Lederman, 291 F.3d at 47 (holding that the defendants were entitled to qualified immunity), Defendants are entitled to judgment in their favor absent "closely corresponding factual or legal precedent" placing them on notice that their conduct was unconstitutional. See Diaz-Bigio, 652 F.3d at 53.

There are two genuine issues of fact precluding summary judgment on qualified immunity grounds. First, as noted above, there is a genuine issue of fact concerning whether Defendants' conduct was motivated by the content of Plaintiff's speech. If the fact-finder determines that this was their motivation,

_____

[9] Defendants attempt to frame the right at issue as a right "to leaflet in front of the main entrance to the PCTA auditorium." (Defs. City of Providence, Dean Esserman, and Paul Kennedy's Mem. in Supp. of Their Mot. for Summ. J. 16, ECF No. 33.) This position appears to be based on an over-reading of Plaintiff's deposition testimony. Plaintiff stated that she had a constitutional right to distribute leaflets "right on a sidewalk at the front of the building." (Ex. 4 to Defs.' Mot. for Summ. J. (Reilly Dep. 71:6-21), ECF No. 33-4.) While Plaintiff claims a right to leaflet in front of the PCTA, she never claimed any right to do so immediately in front of the main entrance. Indeed, Plaintiff testified that she was never closer than fifty feet to the main entrance on the night in question. (Ex. 30 to Pl.'s Mot. (Reilly Dep. 232:10-13), ECF No. 43.)

Defendants are not entitled to qualified immunity. No reasonable officer could have believed that it was constitutional to ban Plaintiff from the lower sidewalk in front of the PCTA, or to order a subordinate to impose such a ban, based on the contents of the flyers she was distributing. <u>See Seattle Affiliate</u>, 430 F. Supp. 2d at 1198.

There is also a genuine issue of fact concerning the scope of Defendants' orders. Plaintiff testified that she was instructed not to distribute flyers anywhere on the approximately 300 foot block in front of the PCTA. Defendants, on the other hand, contend that she was only banned from the 170 foot stretch of lower sidewalk in front of the steps.[10] While this dispute is not material to the merits of Plaintiff's First Amendment claim, it is material to the issue of qualified

---

[10] Plaintiff argues that Defendants have failed to properly dispute this fact. She points out that Defendants City, Esserman, and Kennedy, in their statement of undisputed facts, admitted that "DeAndrade ordered the four patrolmen to clear the sidewalk." (Defs.' SUF ¶ 32, ECF No. 34.) Defendants then attempted to dispute an identical statement in Plaintiff's statement of undisputed facts. (Defs.' SDF ¶ 56, ECF No. 48 ("Defendant DeAndrade clarified in her deposition that Plaintiff 'was allowed to stay on the sidewalk, just not in front of where the building was.'").) The Court declines Plaintiff's invitation to seize upon this technicality to overlook a genuine issue of material fact that is clearly supported by the record. <u>See</u> <u>supra</u> p. 6. "To be binding, a judicial admission must be clear." <u>Harrington v. City of Nashua</u>, 610 F.3d 24, 31 (1st Cir. 2010) (internal quotation marks omitted). It is not clear from the face of Defendants' statement of undisputed facts whether the phrase "clear the sidewalk" refers to the entire sidewalk or merely a portion of it.

immunity.   No reasonable officer could believe that it was constitutional to ban Plaintiff from the entire block absent any evidence that she was obstructing pedestrian traffic or interfering with any other substantial government interest.   See Grace, 461 U.S. at 182.   The fact that the PCTA was hosting an event with a possible attendance of approximately 396 people on the night in question does not alter this conclusion.   See Kuba, 387 F.3d at 863 n.13 (holding restrictions on expressive conduct outside an arena that hosts circuses and rodeos unconstitutional despite the fact that average attendance at these events was about 10,000); Weinberg, 310 F.3d at 1033-34 (holding a ban on peddling within 1,000 feet of a sports arena unconstitutional). Defendants' reliance on Marcavage v. City of New York is misplaced.   The Mayor's State of the City address cannot be fairly analogized to a major political convention expected to draw 50,000 people.  See Marcavage, 689 F.3d at 101.[11]

---

[11]  In the context of supervisory liability, the clearly established element of the qualified immunity inquiry is satisfied "when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998).  Here, taking the facts in the light most favorable to Plaintiff, it was clearly established that Esserman and Kennedy would be liable for DeAndrade's violation of Plaintiff's rights.   With respect to Kennedy, the term "supervisory liability" is a misnomer.   Plaintiff alleges that he directly participated in the First Amendment violation by instructing DeAndrade to "move [Plaintiff] from the front of the building" and "clear the

Assuming, however, that Defendants' orders were content-neutral and applied only to the 170 foot stretch of sidewalk in front of the PCTA stairs, a reasonable officer could have believed that those orders were constitutional.  The PCTA's unique configuration sets this case apart from the precedent cited by the parties.  The side of the building adjacent to Cranston Street features multiple doors that open into a plaza area.  Given the government's substantial interest in protecting public safety, Defendants could constitutionally have restricted expressive conduct in the immediate vicinity of these doors.  See Jews for Jesus, 984 F.2d at 1326 (suggesting that a ban on expressive conduct in "a 15-foot safety zone around elevators, stairwells, kiosks, [and] turnstiles" in train stations was constitutional).  Their orders violated the First Amendment because they extended to the entire plaza area as well as the sidewalk in front of it.  However, as the parties have pointed to no "closely corresponding factual or legal precedent," this

---

sidewalk."  See Braun v. Maynard, 1:09-CV-1897, 2010 WL 1375172, at *4 n.5 (D. Md. Mar. 31, 2010) (explaining that supervisory liability "is distinct from allegations directly against the Supervisory defendants for promulgating an unconstitutional policy and ordering an unconstitutional search"), aff'd, 652 F.3d 557 (4th Cir. 2011).  Similarly, Esserman is not entitled to summary judgment on qualified immunity grounds because a reasonable jury could find that his deliberate indifference to an unconstitutional custom caused the First Amendment violation.  See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994); infra pp. 29-34.

Court finds that a reasonable police officer could have believed that an order to limit Plaintiff's leafleting within the 170 foot span of sidewalk directly in front of the auditorium's multiple doors was narrowly tailored to the government's substantial interest in protecting public safety.  See Diaz-Bigio, 652 F.3d at 53.

Jews for Jesus and the other cases cited by the parties in their briefing on qualified immunity involve intermediate First Amendment scrutiny.  In a footnote in the merits section of her brief, Plaintiff suggests that heightened scrutiny applies to police directives like the ones at issue here.  As previously discussed, a reasonable officer could have believed that a ban on leafleting in front of the PCTA steps was sufficiently tailored to satisfy intermediate scrutiny.  It is less clear that a reasonable officer could have believed that such a ban "burden[ed] no more speech than necessary to serve a significant government interest," and thus satisfied heightened scrutiny. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994).  However, the Court need not decide this issue because the applicability of heightened scrutiny to police directives was not clearly established at the time of Defendants' conduct. In Madsen, the Supreme Court applied heightened scrutiny to a content-neutral injunction.  Id.  Plaintiff points to only one case decided before February 2, 2010, extending Madsen to the

context of police directives restricting speech in a public forum. McTernan v. City of York, PA, 564 F.3d 636, 655 (3d Cir. 2009) ("We conclude that a police directive, issued by officers in the field, poses risks similar to those presented by an injunction, warranting heightened scrutiny."); see also Huminski v. Corsones, 396 F.3d 53, 92 (2d Cir. 2005) (applying heightened scrutiny to "Notices Against Trespass" issued by court personnel that restricted speech in a non-public forum).   One district court has expressly held that McTernan and Huminski do not render the application of heightened scrutiny outside the context of injunctions clearly established.   Ross v. Early, 758 F. Supp. 2d 313, 330 (D. Md. 2010).

For the foregoing reasons, assuming that Defendants were not motivated by the contents of Plaintiff's flyers and that the restrictions imposed on Plaintiff's speech were limited to the 170 foot stretch of sidewalk in front of the PCTA stairs, Defendants' conduct would not have violated Plaintiff's clearly established rights.   Thus, if the fact-finder resolves both of these issues in their favor, Defendants Esserman, Kennedy, and DeAndrade will be protected by qualified immunity and may not be held liable for damages in their individual capacities.   But this conclusion is dependent upon and must await a determination by the fact-finder; therefore, at this stage, Defendants'

motions for summary judgment on qualified immunity grounds must be denied.

### C.   Municipal Liability

While "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," it may be held liable "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  A single action by a decision-maker possessing "final authority to establish municipal policy" may expose a municipality to liability.  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion).

In the present case, Defendants do not seriously dispute Plaintiff's contention that Esserman possessed final authority with respect to PPD policy.  Indeed, Esserman testified that, as Chief of the PPD, he was "the ultimate authority" on all Department policy.  See Young v. City of Providence, 396 F. Supp. 2d 125, 141-46 (D.R.I. 2005) (holding that the plaintiff presented sufficient evidence that the Chief of the PPD possessed final policymaking authority on training issues to survive summary judgment).

Plaintiff contends that the PPD has a policy of keeping "exit passageways" clear, and that this policy was applied in a

constitutionally deficient manner.  There is no evidence that
Esserman promulgated any written or formal PPD policy to this
effect.  Nonetheless, Plaintiff can establish a municipal
custom, also sufficient to create liability, by meeting two
requirements:

> [f]irst, the custom or practice must be attributable
> to the municipality.  In other words, it must be so
> well-settled and widespread that the policymaking
> officials of the municipality can be said to have
> either actual or constructive knowledge of it yet did
> nothing to end the practice. . . .  Second, the custom
> must have been the cause of and the moving force
> behind the deprivation of constitutional rights.

Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)
(citations omitted).

Here, there is little question that Esserman, a municipal
policymaker, was on constructive, if not actual notice of the
practice of clearing exit passageways.  Indeed, when asked at
his deposition whether keeping exit passageways open was a
"proper uniform practice" of the PPD, Esserman responded in the
affirmative.  (Esserman Dep. 66:23-25.)  The pervasive nature of
the practice is also evidenced by the fact that all Defendants
in this case cited the need to keep exit passageways clear in
response to an interrogatory asking why Plaintiff was ordered to
relocate.

However, the custom of keeping exit passageways open is, on
its face, not only constitutional but also quite sensible.  In

this manner, the present case is distinct from Bordanaro, which involved a "facially unconstitutional practice of breaking down doors without a warrant when arresting a felon." 871 F.2d at 1156. A facially constitutional custom may serve as a predicate for municipal liability where it is "consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." Gregory v. City of Louisville, 444 F.3d 725, 752 (6th Cir. 2006). Here, Plaintiff has introduced sufficient evidence to demonstrate that Esserman was on notice of the fact that the custom of clearing exit passageways was applied in a manner that deprived citizens of their constitutional rights. At Esserman's deposition, defense counsel asked, "[s]o whether you call it the front of the building or along the front of the stairway, that was an exit passageway for purposes of application of this policy and, in your opinion, was properly applied in this situation; is that accurate?" (Esserman Dep. 73:22-74:1.) Esserman simply replied, "[y]es." (Id. at 74:2.) Similarly, when asked whether he felt that the general practice was "properly applied in this case," Esserman responded that, while he did not have an "independent memory" of the events in question, DeAndrade's actions "seemed very straightforward and proper" based on his subsequent review. (Id. at 75:25-76:15.) Finally, Esserman agreed with defense counsel that the training received by PPD

31

officers "taught them that the directive to relocate Ms. Reilly in this case was within constitutional bounds."[12]   (Id. at 82:15-21.)   In essence, Esserman's deposition testimony tells us what the vaguely-worded practice of "keep[ing] open exit passageways" actually means.   DeAndrade's actions in this case are representative of that custom.   See Bordanaro, 871 F.2d at 1156 (finding the existence of a municipal custom based on "[t]estimonial evidence" from a police sergeant that he had been present at between twenty and sixty situations involving door breakdowns and that the conduct at issue was representative of "the way [the department had] always applied" the custom).

---

[12] Plaintiff frames the City's failure to adequately train officers on the First Amendment as a second basis for municipal liability.   In support of this argument, she cites a series of cases standing for the proposition that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (emphasis added).   Here, however, Plaintiff admits that her failure to train claim is "unusual."   (Pl.'s Reply Mem. of Law in Supp. of Her Mot. for Partial Summ. J. and in Opp'n to Mot. for Summ. J. of Defs. City of Providence, Dean Esserman, and Paul Kennedy 10, ECF No. 49.)   This is because it is not predicated on "a failure to train or an omission in police training."   (Id.)   Rather, "[l]iability is based on the City affirmatively training police to act in a constitutionally deficient manner."   (Id.)   Indeed, it is undisputed that PPD officers do receive training in the First Amendment rights of citizens.   (Defs.' SUF ¶ 50.)   Plaintiff's failure to train claim really boils down to an allegation that the City trained PPD officers in accordance with its unconstitutional custom. Thus, municipal liability is predicated upon the underlying custom, rather than the training which represents a mere implementation of that custom.

Plaintiff's municipal liability claim garners further support from the depositions of other PPD officers involved in the events at issue. DeAndrade testified that, if in the future she faced a situation identical to the one that presented itself on February 2, 2010, she "would do the same thing [she] did that night." (DeAndrade Dep. 76:9-24.) Moreover, Officers Elie and Stanzione, two of the patrolmen under DeAndrade's control on the night in question, testified that they do not believe they did anything wrong, that their conduct was consistent with the training they received, and that they would take the same action if faced with similar circumstances in the future. (Pl.'s SUF ¶ 148.) These facts alone may have been sufficient to expose the City to liability. See Paul v. City of Altus, 141 F.3d 1185, at *2-3 (10th Cir. 1998) (table) (denying the defendant city's motion for summary judgment where an officer's incident report stated that the defendant officer's action was consistent with their training); Parker v. Town of Swansea, 270 F. Supp. 2d 92, 101 (D. Mass. 2003) (denying the defendant town's motion for summary judgment where an officer testified that the defendant officer's action was "in accordance" with police training and that "he would have done the same thing"). At his deposition, Officer Elie went on to explain that what happened in this case "is not an uncommon thing." (Ex. 35 to Pl.'s Mot. (Elie Dep. 44:22), ECF No. 44.)

33

Assuming then that the fact-finder credits Defendants' explanations of their conduct (including content-neutrality), the custom of clearing vast public spaces in order to keep exit passageways open would clearly be the "moving force" behind the constitutional violation, and, thus, the City would be liable. Indeed, as previously noted, all Defendants pointed to this particular custom to justify their behavior. However, Plaintiff's argument that there is a genuine issue of fact concerning the content-neutrality of Defendants' conduct precludes the Court from granting her motion for summary judgment against the City at this time. If the fact-finder determines that Plaintiff was ordered to relocate due to the contents of her flyers, then the PPD custom concerning exit passageways was not the moving force behind the constitutional violation. (Plaintiff may, nonetheless, recover against the City if the fact-finder determines that Esserman made the decision to restrict Plaintiff's speech based on its content; this is because a single decision by an official with final policymaking authority may expose a municipality to liability under § 1983. See Pembaur, 475 U.S. at 483.)

III. Conclusion

In sum, Plaintiff's First Amendment right to freedom of speech was violated, but there are genuine issues of fact material to which Defendant(s) is liable for that violation. If

the fact-finder determines that Defendants Esserman, Kennedy, and DeAndrade restricted Plaintiff's speech because of its content, those Defendants are individually liable.   In this scenario, the City is liable only if Esserman made the decision to restrict Plaintiff's speech.   If, on the other hand, the fact-finder determines that Defendants' conduct was content-neutral, the City is liable on the basis of its unconstitutional custom.   The individual liability of Defendants Esserman, Kennedy, and DeAndrade will, in this event, depend on the scope of the leafleting ban.   Those Defendants may be entitled to qualified immunity if the restrictions on Plaintiff's speech were limited to the 170 foot stretch of sidewalk in front of the PCTA doors, but not if they applied to the entire approximately 300 foot block.   Because, at this point in the litigation, genuine issues of material fact remain unresolved, the parties' cross-motions for summary judgment are DENIED.


IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: March 22, 2013